Reba J. WEST, Appellant,

v.

SWIFT, HUNT & WESSON a/k/a Swift & Company, Appellee.

No. 87–1539.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1988.

Decided May 27, 1988.

Janet L. Pulliam, Little Rock, Ark., for appellant.

Charles L. Harwell, Springdale, Ark., for appellee.

Before WOLLMAN, Circuit Judge, BRIGHT, Senior Circuit Judge and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

I. INTRODUCTION.

Reba West (West) sued her former employer, Swift, Hunt & Wesson (Swift), alleging that she was demoted because of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court found that Swift articulated a legitimate business reason for demoting West, and dismissed the action. Because we cannot say that the district court was "clearly erroneous" in accepting Swift's proffered reason for West's demotion, we affirm.

## II. BACKGROUND.

West worked in the Swift turkey processing plant in Huntsville, Arkansas for several years as supervisor of the boxing department. In 1980, West was named supervisor of the "Cry–O–Vac" department of the plant, where the turkeys are cleaned, vacuumed, and inspected for quality. Because the Cry–O–Vac department is responsible for the turkey's quality and presentability, it is considered the most important department in the plant.

On April 9, 1984, Swift increased the "line speed"—the rate at which the turkeys are processed. This increase caused problems in all departments, especially the Cry–O–Vac department. Shortly after the line speed increase, West was warned about production problems in the Cry–O–Vac department. On May 22, 1984, six weeks after the line speed increase, West was demoted for failure to adequately manage the employees in her department under the increased production standards. West was offered a job as an hourly employee at the highest hourly rate, but declined the offer and quit.

West filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging she was denied a move to another supervisory position, denied assistance at work, and terminated under circumstances which would not have caused the termination of a similarly situated male employee/supervisor. West received a "right-to-sue" letter and filed a complaint in the United States District Court for the Western District of Arkansas. Following a two and one-half day trial, the district court[1] ruled from the bench that Swift had articulated a legitimate business reason for its actions, and dismissed West's complaint with prejudice. This appeal followed.

## III. DISCUSSION.

The order and nature of proof in a Title VII action is governed by the three-part standard set forth in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's [discharge]." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* at 252–53, 101 S.Ct. at 1093 (citations omitted).

Although the district court found that West carried her relatively light burden of making out a prima facie case for discriminatory treatment under Title VII, it concluded that Swift articulated a legitimate, nondiscriminatory reason for her discharge, *i.e.,* the poor performance of her department. The district court then found that West had not demonstrated that Swift's articulated reasons were a pretext for a discriminatory discharge, a finding that is protected by the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ West attempts to breach this "clearly erroneous" standard with several forceful arguments. West argues first that male supervisors in charge of other departments experiencing productivity problems were not demoted, and emphasizes that her predecessor as Cry–O–Vac supervisor, Keith Bumgarner, was transferred to a specially-created job after he was relieved of his supervisory duties. The record shows, however, that the productivity problems in West's Cry–O–Vac department following the line speed increase were a significant quantum above those experienced in other departments, and that Bumgarner

1. The Honorable Morris S. Arnold, United States District Judge for the Western District of Arkansas.

was not transferred to a specially-created job after his demotion, but became a worker in the Cry–O–Vac department under West.

 West next contends that the district court erred in finding that her demotion was due to losses reflected in Cry–O–Vac department productivity reports. The reports Swift produced at trial showed that the company lost money following the line speed increase due to productivity problems in the Cry–O–Vac department. The district court was convinced that West was demoted because of those losses. West renews the challenges to this statistical evidence she made before the district court, alleging that the decreases in productivity during her tenure were due to understaffing, broken machinery, and incorrect reporting of work delays. West further argues that Swift rectified these problems after she left. These improvements, West maintains, did not reflect her earlier incompetence, but rather Swift's belated response to problems previously ignored, and further evidences the disingenuous nature of Swift's attempts to lay the blame for the earlier losses at her door. After reviewing the record, however, we agree with the district court that the statistics Swift submitted were "in the main, reliable." There is no evidence that Swift deliberately understaffed the Cry–O–Vac department or let the machinery there fall into disrepair after the line speed increase, nor can West substantiate her allegations that work delays in her department were incorrectly reported. In order to accept these arguments, we would have to infer that Swift was willing to endure six weeks of lost profit in order to see West off, and we are unwilling to do so on this record.

West argues, and it is undoubtedly so, that the system by which the statistics were amassed and evaluated was subject to the vagaries of various plant administrators, but this alone does not make out a sexual discrimination claim, for she does not show that Swift's management went beyond the productivity statistics and considered her sex in deciding to demote her. Although West contends the district court erroneously concluded that the statistical reports were "regularly relied on to make business decisions," the testimony is clear that the productivity statistics were widely and consistently used by management to measure a department's performance. More importantly, the district court plainly believed the testimony of the plant manager, Paul Prudhomme, that he relied solely on the use of statistics in deciding to demote West.

West's final argument, that the district court put too much emphasis on the losses Swift suffered following the line speed increase, is really a condemnation of the use of productivity statistics. While we are aware that the use of statistics to grade human activity has not found favor with most subject to their arithmetical indictment,[2] productivity statistics are an inevitable attendant of the twentieth century workplace, and as such are admissible to support or refute a Title VII claim. *See Anderson v. University of Northern Iowa,* 779 F.2d 441, 443 (8th Cir.1985). Although we doubt that the losses Swift suffered can be wholly attributed to West's performance, the issue isn't whether Swift's demotion of West was a statistically sound business decision, or even a fair one, but whether it was based on West's gender. This was a close question in the district court and so it remains on appeal, but West has been unable to draw our attention to any evidence which tips the balance far enough in her favor to overcome the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). Accordingly, the decision of the district court dismissing West's complaint is affirmed.

2. In Benjamin Disraeli's famous philippic against the use of statistics, he characterized an opponent as employing "lies, damn lies, and statistics."